JAMES KIRKMAN and others *v.* WILLIAM BOWMAN, Owner of the Steamer Paragon.

A bill of lading is only *prima facie* evidence of the truth of its contents, as between the parties.

The second clerk of a steamer, may execute on behalf of the boat, a bill of lading in the ordinary way, and his receipt for merchandize delivered on board, will be binding; but to make a special contract—as to bind the boat for articles not delivered on board, his authority must be shown.

APPEAL from the Commercial Court of New Orleans, *Watts,* J.

This was an action to recover from the defendant as owner of the steamer Paragon, $28,000, the value of 850 bales of cotton, alleged to have been received by defendant to be delivered *to* plaintiffs, as will appear from a bill of lading annexed to the petition. The defendant answered by a general denial, averring that he had delivered to plaintiffs all the cotton he ever contracted to deliver to them; and by claiming $10,000 for freight of cotton, and for work and labor done, &c. There was a judgment below, in favor of the defendant, against the plaintiffs, for $3720 73, with interest, from which the latter appealed.

*P. Anderson,* for the appellants. The bill of lading must determine the rights and duties of the parties. It is a contract in writing, and its terms cannot be varied by parol proof. There is no ambiguity in it, and on *all questions as to its meaning,* it must speak for itself. 1 H. Black. 359. 8 Mart. 206. This bill of lading, however, like all other contracts, may be affected by parol, when, by *reason of fraud or mistake,* it varies from the *agreement* on which it was founded; but in such a case, the parol proof is not to ascertain the *meaning of the contract,* but to ascertain the meaning of *the agreement;* and then, if it be proved that the non-conformity of the contract with the agreement arose *from fraud or mistake,* the court will reform the contract, and enforce the rights of the parties according to the reformed contract.

It must be obvious, that such parol proof cannot be admitted under the general issue, but must be the subject of a special answer. At common law, the contract would prevail at law, and the power to reform it belonged to a court of chancery. Giving every latitude to a more loose or liberal practice, it seems to be going too far to admit a defence not disclosed by the answer, but which the answer obviously tends to conceal. 8 Mart. 206.

The judge below seems to think, that the parol evidence in this

case was admissible, because it was offered to *explain the meaning* of the bill of lading ; and he thought it might be done as in the *case of a receipt*, and particularly between the parties to it. Now the case from Blackstone shows the bill of lading to be a contract ; and the case in 8 Martin shows, that parol evidence cannot be admitted to explain it. If it were in the nature of a receipt, it could not be varied by parol. See 3 Mart. N. S. 454. 7 Ibid. N. S. 206. This error of the judge no doubt led him to disregard the exception, that parol proof ought not to be permitted under the general issue.

What then was the contract? It was an engagement on the part of the defendant, to carry a quantity of cotton from Tuscumbia to New Orleans, and to deliver it to the plaintiffs for the sum of $2 50 per bale. We have then only to inquire whether he has delivered it according to the contract. Confessedly he has not. One hundred and twenty bales are missing, and have never been delivered.

The defendants seek to protect themselves by the facts set forth in the depositions ; and say, that the *contract* ought to be reformed, because, by the agreement, they were not to be liable for any loss occasioned by transporting the cotton to Waterloo; a part of the distance, and that their duties, as common carriers, did not commence until the cotton reached that place. Now it is obvious, that this asserts an *agreement* quite different from the *contract*, but independent of its inadmissibility for the reasons above mentioned, two questions are presented for consideration.

First, whether there was any *fraud or mistake*, by reason of which the contract was made to speak a language different from what it ought to have spoken. Such fraud or mistake must exist, or the contract cannot be reformed. " Where each party," says Judge Story, " is equally innocent, and there is no concealment of facts, and no surprise or imposition, the mistake, whether mutual or unilateral, lays no foundation for equitable interference. It is strictly *damnum absque injuria*."

In the case of *Hunt* v. *Rousmanier*, (8 Wheat. 174,) a debtor had agreed with his creditor to give him a security for his debt on a ship belonging to him ; and they agreed, at the same time, as to the mode of doing it, which was by granting a power of attorney to sell the ship and apply the proceeds to the payment of the debt, if it should be unpaid at the expiration of the term of credit. The debtor died, and a bill was filed by this creditor to have his contract reformed, and praying for a decree declaring him to have a mortgage lien on the ship, which was clearly the intention of his debtor to grant him. The court refused to entertain the bill, because there was no mistake or fraud in the taking of the power of attorney. It seems, therefore, unless the defen-

dants in this case can show that they signed the bill of lading from some misapprehension, they ought not to be permitted to set up a parol agreement.

But this view of the case need not be pressed, as it is clear that the second matter suggested for consideration, viz., whether, in point of fact, there was an agreement differing from the contract, is clearly with the plaintiffs. " In all such cases,"—that is, in cases of fraud and mistake, says Judge Story, " if the mistake is *clearly made out*, by proof *entirely satisfactory*, equity will reform the contract, so as to make it conformable to the intent of the parties; but if the proofs *are doubtful* and *unsatisfactory*, and the mistake is not *made entirely plain*, equity will withhold relief, on the ground that the writing ought to be treated as the best evidence of their intent." 1 Eq. Jur. 169.

When the cotton was laden on board of the flats at Tuscumbia, it was at the risk of *some* person as a common carrier. Who was that person? The boats on which it was laden, *belonged to Bowman*, who had purchased them of Reese, Ferrie & Banks. The price agreed to be paid for transportation, was the usual price for transporting goods from Tuscumbia to New Orleans. Does the fact then, that Bowman agreed to pay a portion of the freight thus reserved by the bill of lading, to Reese, Ferrie & Banks, for taking the cotton to Waterloo, in any way diminish his liability to the owners of the cotton? This question arose in the case of *Hyde* v. *The Trent Navigation Company*, 5 Durnford & East, 201. In this case the bill of lading was from Gainsborough to Manchester. The cotton was taken on board defendants' barge on the Trent, and was safely landed and warehoused in the Duke of Bridgewater's warehouse, in Manchester, where it was destroyed by fire. The question was, whether the *risk* of the carrier continued until the cotton was delivered to the plaintiff, who resided in the town. The following facts were proved : It was the practice of some persons to send their own carts to the warehouse, but the *general usage was* for the defendants to furnish carts to carry the cotton from the warehouse to the house of the owner. *But the defendants had discontinued* the business of carting, *and all the profits of that portion of the business was given over to one Hubbard, which fact was known to the plaintiff.* The court declared the defendants to be liable, *because* they had *made a charge for conveying it to the owner ;* and, although it was known to the plaintiff that this charge was paid over to another, for whose use they collected it, yet the defendants' liability was not thereby diminished.

"In this case," says Lord Kenyon, "there is one peculiar circumstance that makes it unnecessary to decide the general question, and that is the *charge made* by the defendants for the cart-

age at Manchester."—" I am glad," says Ashhurst, J. "to find one circumstance which puts the case out of all doubt, namely, that one of the bills contains a charge for cartage, which is decisive to show, that the liability continued until the goods were delivered."

If then, the fact of charging cartage was decisive of the question of the defendants' liability, for the carriage of the goods from the warehouse to the plaintiff's residence, is not the fact that Bowman charged the owners of the cotton for transportation from Tuscumbia to Waterloo, equally decisive of his liability to them. And if he paid the whole, or a part of it, to Reese, Ferrie & Banks, that can no more change his liability than did the fact of the cartage being paid over to Hubbard, a fact well known to the plaintiff.

That Bowman did charge for transportation from Tuscumbia to Waterloo is apparent, not from the bills of lading alone. He settled with the consignees at $2 50 per bale. Now it is in evidence, that this is the price of transportation from Tuscumbia. The price from Waterloo was two dollars. The fifty cents was made up of twenty-five cents warehouse charges, which was not properly storage, but a premium paid by the boats for a preference given them over other boats ; and of twenty-five cents for lighterage to Waterloo. Both these sums, it will be observed, are charged to the owners in the bill of lading, and collected of the consignees.

Reese, Ferrie & Banks did not, in lightering the cotton, act as agents for the owners, but as agents for the steamboat ; and if they have not discharged their duty, they are responsible to their employers.

But the defendant's counsel rely on the want of capacity of the consignees, to sue for non-delivery. This is not law—the case relied on does not bear them out. Abbott on Shipping, 391. The case was on an assignment of the bill of lading by the consignor to one *as his agent.* It was not a consignment to a factor for sale. Such a consignee has a special property by the delivery to the carrier. The bill of lading itself, is evidence of property in the consignee. 2 Campb. 38. 2 T. R. 71.

The defendant's counsel refer to Abbott, 216. That writer says, that if the person to whom the consignor, *on a bill of lading to deliver to the consignee or his assigns,* directs the delivery to be made *to an agent, having no property in the goods,* such agent cannot, in his own name, maintain a suit for non-delivery. He cites the case of *Waring* v. *Cox.* It will be seen, by looking into the case, (4 East, 211,) that the consignor sent the bill of lading to an agent to enable him to receive the goods for his use, in case the consignee should fail. He sent an unendorsed bill of lading to

the consignee. Now the court held, that the *shipping of the goods* to the consignee vested the property, subject only to be divested by the right to stop *in transitu*, and that the consignee having got possession, that right was destroyed, although the carrier ought not to have delivered the goods. The court intimate a doubt, but do not decide, that the agent to whom the bill of lading was sent, could not sue in his own name.

*Elwyn*, on the same side.

*R. H. Chinn*, for the defendants. The testimony of witnesses was admissible, between the parties to a bill of lading, to explain their intentions. 17 Mass. 257. 14 Johns. 210. 20 Johns. 338. 3 Serg. & Rawle, 309. 1 Haywood, 70. 3 Cranch, 311. 3 Starkie, 1014, 1044, 1729, 1730. 2 Mart. N. S. 122, 333. 8 Mart. N. S. 542. A mere naked consignment gives no right to the consignee to maintain this suit. Abbott, 216.

*Vason* and *P. W. Farrar*, on the same side.

BULLARD, J. The only question which this voluminous record presents for our consideration is, whether one of the flat-boat loads of cotton, which the steamboat Paragon engaged to tow down the river from Waterloo, on the Tennessee river, was at the risk of the boat in its transit over the Colbert shoals, and until delivered and received at Waterloo, about thirty miles below Tuscumbia.

It is necessary to premise, that it was in contemplation to send down by the steamboat Paragon, besides some bales on board, four flat-boats loaded with cotton, which were to be sent over the shoals and taken in tow at Waterloo, the cotton being at Tuscumbia. The pilot of the boat was dispatched up the river, and brought down two of the flats. Another, which is the one in controversy, was sent down by the steamboat Stacker, arrived safe at Waterloo, but was sunk some hours afterwards, without ever having been delivered to the boat, or even notice given to the captain or owners that it was one of the flats intended for the Paragon. The second clerk of the Paragon, who had been left at Tuscumbia, it would appear, for the purpose of checking off or taking a note of the bales laden on board the flats, signed a bill of lading at Tuscumbia while the boat was at Waterloo, in the following form: "Shipped in good order and condition, by Reese, Ferrie & Banks, for account and risk of owners, on board flat-boats to be towed by steamboat Paragon, whereof Ragland is

master, now lying in the Tennessee river, and bound for New Orleans." The freight was at the rate of $2 75 per bale.

The court, in our opinion, did not err in letting in all the parol evidence relating to the transaction, though tending to contradict the bill of lading, which the court correctly regarded as only *prima facie* evidence of the truth of its contents between the parties; more especially in this case, where, even admitting the authority of the second clerk to sign a bill of lading for articles actually delivered on board, it does not follow that he had authority to make a special contract, and to dispense with the delivery of the property to be conveyed. Again; the bill of lading may be strictly true, that the cotton had been put on board the flat to be towed by the Paragon, and yet the liability of the owners of the Paragon not shown, without proof of a special engagement, that the cotton thus laden should be at the risk of the Paragon from Tuscumbia to New Orleans, while under the charge of persons not employed by them, and unknown to them.

The evidence thus let in to show what was the agreement between Bowman, the owner of the steamer Paragon, and Reese, Ferrie & Banks, the shipping agents of the planters who owned the cotton, shows pretty clearly in relation to the flat-boat which was sunk, that it was to have been delivered by Reese, one of the partners at Waterloo. He testifies himself that he agreed to send the flats, when loaded, to Waterloo to the steamer Paragon. It is true, he insists that the flat was at the risk of the defendant. There is a circumstance which makes against the idea that the load of cotton was to be at the risk of the boat from Tuscumbia. It is, that Bowman was to purchase the boat itself, if it was of a particular quality. It does not appear that that contract was ever completed, for Bowman never saw the boat before she was sunk. The presons charged by Reese to take her over the shoals, never gave him notice that it was the one destined for the Paragon. The captain of the boat is far from proving that Bowman agreed to take the flats on his responsibility at Tuscumbia. He states, that Reese, Ferrie & Banks received lighterage on the two last flats. Two had been taken down by the pilot of the Paragon.

Three witnesses swear positively, that the bargain between Bowman and Reese was, that the flats were not to be at the risk

of the boat; that they were to be sent down to Waterloo by the shippers, and received there to be towed. The second clerk was left behind for the purpose of taking an account of the cotton, as it was laden on board the flats. It appears also, that although the lighterage from Tuscumbia to Waterloo was included in the bill of lading, yet it was only advanced by the boat; that it was in fact received by Reese, Ferrie & Banks. It constituted a charge upon the cotton, and not a part of the freight.

We concur fully with the court below in the opinion, that no custom has been shown in relation to the trade of those places, which should make owners of boats liable for the risk of conveying cotton over the shoals, without their consent.

The argument of the counsel for the plaintiff would have great weight, if the bill of lading signed by the second clerk of the boat were conclusive upon the defendants. It would show a special agreement in conformity to the alleged usage of the trade, and a charge of freight from Tuscumbia. But it is not pretended that any such contract was made with the clerk, nor indeed any at all, except what results from the signature of the bill of lading. He might well have authority to execute a bill of lading in the ordinary way, and his receipt for merchandize on board would bind the boat; but his authority must be shown to make a special contract. In this we think the plaintiffs have failed.

In the case cited from 5 Durnford & East, no question arose as to the authority of the agents who had given the receipt for the goods to be delivered in Manchester, and which included the charge for cartage at Manchester, from the Duke of Bridgewater's warehouses into the city. The goods were left in the warehouses (which were destroyed,) by the carriers who had engaged to convey them into town, having received the cartage. This last was regarded by Lord Kenyon as the decisive fact in the case; and so it would be in this case, if the liability of the parties were to be measured by the bill of lading alone.

There is but one matter in relation to this case, in which we do not concur in the opinion expressed by our learned brother of the Commercial Court, to wit, that equally strong reasons could be given for deciding the other way.

*Judgment affirmed.*